151 P.3d 1067 (2007)
PUBLIC UTILITY DISTRICT NO. 1 OF CLARK COUNTY, a Washington municipal corporation, / 33707-0-II, Appellant,
v.
POLLUTION CONTROL HEARINGS BOARD; Port of Vancouver, USA, a Washington municipal corporation; and Support Terminals Operating Partnership L.P., dba ST Services, a Texas limited partnership, Respondents.
Nos. 33427-5-II, 33707-0-II.
Court of Appeals of Washington, Division 2.
February 6, 2007.
*1068 Sarah Ellen Mack, Mentor Law Group PLLC, Seattle, WA, for Appellant.
Laura Maffei, David F. Bartz Jr., Attorneys at Law, Portland, OR, Stephen J. Tan, Cascadia Law Group, Seattle, WA, Maia D. Bellon, Atty. Generals Office/Ecology Div., Sarah Bendersky, Attorney Generals Office, Olympia, WA, for Respondents.
PENOYAR, J.
¶ 1 Clark County Public Utility District No. 1(CPU) obtained permits for wellfield testing from the Department of Ecology (Ecology). The Port of Vancouver (the Port) and Support Terminals Operating Partnership, L.P. (ST) successfully argued to the Pollution Control Hearings Board (the PCHB) that the permit violated the State Environmental Policy Act (SEPA). We reverse because the permit authorized preliminary testing only and was exempt from SEPA under WAC 197-11-800(17).

FACTS
¶ 2 CPU is a public utility district that provides water services in Clark County, Washington. It is working to establish additional water sources in the county and in 2001 it updated Clark County's Water System Plan (the Plan) to include a new wellfield project in the Vancouver Lowlands area near the Columbia River. Since the early 1990s, Ecology has been aware of groundwater contamination in the Vancouver Lowlands. Trichloroethylene (TCE) contamination has been discovered in portions of the soil and groundwater and is traced to property owned by the Port and ST.
¶ 3 CPU began analyzing the "Fruit Valley" site in the Vancouver Lowlands as a potential location for the new wellfield project and applied to Ecology for a groundwater rights application for Fruit Valley. 2 CP at 23.[1] The groundwater near the Fruit Valley site contains TCE contamination that is currently being captured and treated by air stripping technology to remove the TCE.
¶ 4 In 2001, CPU applied to Ecology for a preliminary permit to allow testing at Fruit Valley. CPU wanted to collect data to assess whether Fruit Valley is an appropriate location for groundwater extraction and the new wellfield project. The testing would monitor "draw down" time and measure the distance draw down occurs from the pumping well. The data would help CPU determine underground water movement and would be a critical component in developing models to predict the impact that a new wellfield project at Fruit Valley would have on the groundwater contamination. It is undisputed that the permit's testing would have a temporary and limited impact on the contaminated groundwater. It would move the boundary of the contamination approximately two to four feet but, after testing ceased, the contamination is expected to return to its prior contained location.
*1069 ¶ 5 Ecology approved the permit in 2003, stating it did not anticipate that the testing would have a significant impact on the contamination. It emphasized that, "[n]o beneficial use of the water is allowed [under the permit] and issuance of a preliminary permit is not a guarantee of approval of the underlying [ground water rights] application." Administrative Record Unified Hearings Exhibits (AR Ex.) 1 at 0002. It further explained:
. . . the overall objective of the preliminary permit is to obtain sufficient hydrogeologic data to support a decision on the water right application. Information collected through the preliminary permit will be used by Ecology to evaluate water availability, impairment of existing rights, and whether or not the proposed withdrawal would be detrimental to the public welfare. Hydraulic properties of the aquifers to be tapped by the proposed wells need to be reliably quantified in order to adequately address the subject application.
AR Ex. 1 at 0002.
¶ 6 It is also undisputed that a wellfield project at Fruit Valley would disrupt the current configuration of the contaminated groundwater. But, using data collected from the preliminary testing, CPU hopes to analyze the groundwater movement in the Vancouver Lowlands area to determine what steps might be necessary to effectively contain the existing contamination if the new wellfield project is built at Fruit Valley. CPU's groundwater rights application is still pending and has not yet been approved or rejected.
¶ 7 The Port, ST, the Fruit Valley Neighborhood Association, and the City of Vancouver protested the proposed wellfield project at Fruit Valley. The Port and ST are concerned that it will cause the contamination to migrate into the aquifer and contaminate the groundwater. The Port and ST have collectively spent over $10.7 million in efforts to remedy the TCE contamination from their properties.
¶ 8 The Port and ST filed a petition with the PCHB, arguing that Ecology's authorization of the preliminary permit violated SEPA. The PCHB held a hearing in 2004 and because Ecology should have required SEPA review before it approved the preliminary permit, it reversed Ecology's authorization of the permit and concluded that the permit was not categorically exempt and that, as a matter of law, the testing under the preliminary permit would limit the choice of reasonable alternatives and violate SEPA because "[t]he coercive effect of the well construction and testing is evident." 88 N.Y. 600, 2 CP at 43. Finally, the PCHB found that CPU violated SEPA by failing to submit an environmental checklist with the preliminary permit application.
¶ 9 CPU then initiated environmental review of the Fruit Valley site. It hired a consultant who prepared an environmental checklist and applied to Ecology for a preliminary permit for the wellfield testing at Fruit Valley, including the environmental checklist. Ecology approved the permit.
¶ 10 The Port and ST again filed a petition with the PCHB. The parties stipulated that the actions permitted by the preliminary permit would not have an adverse environmental impact. But, the Port and ST sought summary judgment dismissing Ecology's permit approval under collateral estoppel and res judicata. They argued that the PCHB previously found that the permit would serve to limit the choice of reasonable alternatives and, since the action proposed under the permit was the same as that under the previous permit, they argued that collateral estoppel applied. In 2005, the PCHB granted summary judgment in favor of the Port and ST, finding that collateral estoppel barred the action. CPU and Ecology appealed.

ANALYSIS
I. STANDARD OF REVIEW
¶ 11 Both decisions here are appeals from the PCHB, an administrative agency. We review PCHB orders under the Washington Administrative Procedure Act (WAPA). Port of Seattle v. Pollution Control Hrgs. Bd., 151 Wash.2d 568, 587, 90 P.3d 659 (2004). Under the WAPA, we may find that an agency erred if it erroneously interpreted or misapplied the law. RCW 34.05.570(3)(d). We review the facts on the record before the PCHB to determine if *1070 substantial evidence supports them and we review conclusions of law de novo. Biermann v. City of Spokane, 90 Wash.App. 816, 821, 960 P.2d 434 (1998); RCW 34.05.558. If statutory construction is necessary, we interpret statutes de novo. Port, 151 Wash.2d at 587, 90 P.3d 659. The burden of demonstrating the invalidity of the PCHB's action is on the party asserting invalidity here, CPU and Ecology. RCW 34.05.570(1)(a).
II. AGENCY DEFERENCE
¶ 12 The parties disagree on which agency we give deference to in this case. CPU contends that Ecology is the agency charged with administration of Washington's water code and that we should give deference to Ecology's interpretations. The Port and ST argue that we should give deference to the PCHB.
¶ 13 If interpretation of a statute falls within an agency's expertise, the agency's interpretation of the statute is accorded deference, so long as that interpretation does not conflict with the statute's plain language. Port, 151 Wash.2d at 612, 90 P.3d 659. The Legislature designated Ecology to regulate Washington's water code, and we give Ecology's interpretation of statutes and regulations dealing with water resources great weight. Port, 151 Wash.2d at 612, 90 P.3d 659. Ecology is also charged with the rule-making powers to implement and interpret SEPA and to determine which categories of governmental actions are not "potential major actions significantly affecting the quality of the environment." RCW 43.21C.110(1)(a). We therefore give deference to Ecology's interpretation which actions are categorically exempt from SEPA, and we give deference to the PCHB's findings of fact. See Port, 151 Wash.2d at 612-13, 90 P.3d 659.
III. STATE ENVIRONMENTAL POLICY ACT
¶ 14 Generally, SEPA and its implementing regulations require that the government conduct environmental review, through at least a threshold determination, for any proposal that meets the definition of an action. Kucera v. Dep't of Transp., 140 Wash.2d 200, 214, 995 P.2d 63 (2000). The basic purpose of SEPA's command for environmental review is to require governments to fully consider environmental and ecological factors when taking actions that significantly affect the quality of the environment. King County v. Wash. State Boundary Review Bd., 122 Wash.2d 648, 659, 860 P.2d 1024 (1993). The National Environmental Protection Act (NEPA) is substantially similar to SEPA, Washington Courts may look to federal caselaw for SEPA interpretation. Des Moines v. Puget Sound Council, 98 Wash. App. 23, 28 n. 28, 988 P.2d 27 (1999). NEPA requires the government to take a "hard look" at environmental and ecological factors in reaching decisions; it does not require that the government always make environmentally sensitive decisions. Nat'l Audubon Soc'y v. Dep't of the Navy, 422 F.3d 174, 184 (Fourth Cir.2005). An agency decision is acceptable under NEPA even if negative environmental impacts will result, as long as the agency considered the impacts and still decided that other benefits outweighed them. Nat'l Audubon Soc'y, 422 F.3d at 184.
¶ 15 SEPA requires that a government entity prepare an environmental impact statement (EIS) for proposals or actions that are likely to have a significant, adverse environmental impact. RCW 43.21C.031(1). SEPA encourages starting environmental review at the earliest opportunity. Klickitat County Citizens Against Imported Waste v. Klickitat County, 122 Wash.2d 619, 646, 860 P.2d 390 (1993). Because actual installation and use of the wells for the new wellfield project could have substantial environmental impacts, SEPA compliance is potentially required.
A. CATEGORICAL EXEMPTION
¶ 16 CPU argues that the preliminary permit is categorically exempt from SEPA under WAC 197-11-800(17). Under WAC 197-11-800(17) the following is categorically exempt from the SEPA requirements:
Information collection and research. Basic data collection, research, resource evaluation, requests for proposals (RFPs), and the conceptual planning of proposals shall be exempt. These may be strictly for information-gathering, or as part of a study leading to a proposal that has not *1071 yet been approved, adopted or funded; this exemption does not include any agency action that commits the agency to proceed with such a proposal. (Also see WAC 197-11-070.)
¶ 17 In this case, the PCHB found that the preliminary permit was not categorically exempt from SEPA because the test well proposed under the permit was not designed primarily for data collection because the test well's specifications were calculated to accommodate full production if the new wellfield project is approved at Fruit Valley. We disagree. The preliminary permit is exempt from SEPA because it fits under the categorical exception for data collection and research in WAC 197-11-800(17).
¶ 18 Under the permit, CPU applied for authorization of testing to collect data it could use to monitor draw down time and to measure the distance draw down occurs from the pumping well. It is undisputed that the information obtained would be helpful to CPU in determining aquifer transmissivity, which is a critical component CPU used to develop models to predict the impact of a new wellfield project at Fruit Valley on the contaminated groundwater. The PCHB found that one of CPU's primary goals in analyzing groundwater movement in the Vancouver Lowlands area is to determine what steps might be necessary to effectively contain the contaminated groundwater.
¶ 19 Ecology expressly stated that the overall objective of authorizing the tests was to obtain hydrogeologic data to assist Ecology in deciding whether to issue water rights to CPU under their pending groundwater rights application. A year after Ecology first approved the preliminary permit, it reiterated that it was only authorizing the preliminary permit, not the application for groundwater rights for a new wellfield project. Ecology explained, "collection of additional data, without causing spreading of contamination, would be beneficial, and would have no significant environmental impacts." Administrative Record (PCHB No. 04-143) at 1248. It further emphasized that, "The granting of this preliminary permit shall not be construed, by inference or otherwise, that the subject application [for groundwater rights] will ultimately be approved." PCHB No. 04-143 at 1250.
¶ 20 We give deference to Ecology's decision that the permit was exempt from SEPA and hold that the PCHB erred in finding that the permit was not categorically exempt from SEPA. Port, 151 Wash.2d at 612-13, 90 P.3d 659. We reverse the PCHB's decision because the record demonstrates that the main objective of the permit was to authorize testing to be used for research purposes and the categorical exemption for information collection and research therefore applies.
B. THE TWO PART TEST UNDER WAC 197-11-070
¶ 21 Interpretation and application of the administrative code is a legal question that we review de novo. Girton v. City of Seattle, 97 Wash.App. 360, 363, 983 P.2d 1135 (1999). At the end of the section, WAC 197-11-800(17) specifically references WAC 197-11-070 and the two provisions must be read together. Although we hold that the preliminary permit is categorically exempt, we must next analyze whether the preliminary permit violates WAC 197-11-070. A proposal that is "a series of actions, physically or functionally related to each other, some of which are categorically exempt and some of which are not," must also comply with WAC 197-11-070. WAC 197-11-035. It is clear that the Legislature intended that the requirements of WAC 197-11-070 must be met even when an action is categorically exempt from other SEPA provisions under WAC 197-11-800(17).
¶ 22 WAC 197-11-070 establishes a two-part test that limits actions taken during the SEPA process:
(1) Until the responsible official issues a final determination of nonsignificance [DNS] or final environmental impact statement [EIS], no action concerning the proposal shall be taken by a governmental agency that would:
(a) Have an adverse environmental impact; or
(b) Limit the choice of reasonable alternatives.
*1072 WAC 197-11-070(1). This provision applies during the SEPA review process, before a DNS or EIS is issued. WAC 197-11-070(1). CPU argues that the action authorized under the preliminary permit does not violate WAC 197-11-070(1) because it will not limit the choice of reasonable alternatives. The Port and ST counter that the studies proposed under the permits would "limit the choice of reasonable alternatives" because the test wells would have a "coercive effect" on the Ecology's approval of the eventual groundwater rights application. Br. of Resp't (ST) at 20; Br. of Resp't (the Port) at 29. They also argue that the significant cost of the testing would have a coercive effect on CPU.
¶ 23 The parties stipulated that the actions the preliminary permit allows would not have an adverse environmental impact. Therefore, the only issue is whether the preliminary permit limited the choice of reasonable alternatives.
¶ 24 SEPA defines "reasonable alternative" as:
an action that could feasibly attain or approximate a proposal's objectives, but at a lower environmental cost of decreased level of environmental degradation. Reasonable alternatives may be those over which an agency with jurisdiction has authority to control impacts, either directly, or indirectly through requirement of mitigation measures.
WAC 197-11-786 (emphasis added). The Washington Supreme Court has emphasized that the focus of SEPA is environmental impacts, explaining that a reasonable alternative is one that could feasibly attain or approximate a proposal's objectives at a lower cost to the environment. King County v. Cent. Puget Sound Bd., 138 Wash.2d 161, 184-85, 979 P.2d 374 (1999) (emphasis added). We find no Washington cases specifically addressing the definition of reasonable alternatives in SEPA and the definition of reasonable alternatives in SEPA is an issue of first impression.
¶ 25 Ecology explained to the Port that it granted the preliminary permit only to assist CPU in gathering information to help Ecology decide whether to grant CPU's application for a new wellfield project at Fruit Valley. Ecology wrote:
Ecology has consistently stated that issuance of a preliminary permit in no way predisposes the agency to an affirmative decision on the water right application . . . The preliminary permit does not indicate any support by Ecology of [CPU's] proposed wellfield; the preliminary permit is solely for research/data collection.
AR Ex. 67 at 0002.
¶ 26 Ecology has repeatedly stated that its approval of the preliminary permit will have no influence on whether it approves CPU's application for groundwater rights at Fruit Valley. A "reasonable alternative" under SEPA is an alternative with a "lower environmental cost." WAC 197-11-786. There is nothing in the record to suggest that Ecology's approval of the preliminary permit would coerce Ecology to grant groundwater rights at Fruit Valley simply because it issued the permit.
¶ 27 The estimated financial cost for the exploratory drilling, testing, and monitoring is approximately $109,430. AR Ex. 60 at 0001. We agree that CPU's "reasonable alternatives" could be limited if it was forced to put all of its financial resources in one project. It is conceivable that CPU's financial investment in Fruit Valley could limit the choice of other alternatives to Fruit Valley for the wellfield project. If CPU invested significant financial resources in building test wells at Fruit Valley, it might be less inclined to explore alternate sites that could have a lower environmental impact. However, at oral argument, the parties agreed that CPU's cost for the testing was a small fraction of CPU's overall cost to build the entire wellfield project. Also, CPU has repeatedly stated that it is seeking to drill the test wells to obtain data to assess the environmental impact of a wellfield site at Fruit Valley. CPU has never stated that the test wells are a first step in building the overall wellfield site. We hold that the testing will not serve to limit the choice of reasonable alternatives available to Ecology or CPU for the wellfield project and reverse the PCHB's decision.
¶ 28 The Port and ST argue that substantial evidence supports the PCHB's conclusion *1073 that enough information exists to conduct meaningful environmental analysis even without the testing authorized under the preliminary permits. They argue that the wellfield testing is not necessary, and that CPU should commence SEPA review at the earliest possible point, consistent with WAC 197-11-055(2). Under SEPA, an agency is required to prepare a threshold determination and EIS at the earliest possible point in the planning and decision-making process. WAC 197-11-055(2). Because we hold that the preliminary permit is categorically exempt from SEPA, WAC 197-11-055 does not apply here. Because we hold that the preliminary permit is exempt from SEPA, we need not address the other arguments raised by the parties. We reverse and remand to the PCHB for proceedings consistent with this opinion.
We concur: HOUGHTON, C.J., and BRIDGEWATER, J.
NOTES
[1] For clarification purposes, we are referring to the Clerk's Papers as follows: (1) Clerk's Papers filed on September 27, 2005 will be 1 CP; (2) Clerk's Papers filed on October 4, 2005 will be 2 CP; and (3) Clerk's Papers filed on September 14, 2006 will be 3 CP.