[No. 36974-5-II. Division Two. April 21, 2009.]

COMMUNITY ASSOCIATION FOR RESTORATION OF THE ENVIRONMENT, *Petitioner*, v. THE DEPARTMENT OF ECOLOGY, *Respondent*, NORTHWEST DAIRY ASSOCIATION ET AL., *Intervenors*.

832

*Michael J. Robinson-Dorn* (of *University of Washington School of Law*) (*Charles M. Tebbutt*, of counsel), for petitioner.

*Robert M. McKenna, Attorney General,* and *Ronald L. Lavigne, Jr.,* and *Sonia A. Wolfman, Assistants,* for respondent.

*Bill Clarke,* for intervenor Washington State Dairy Federation.

*John R. Nelson* and *Lori A. Terry* (of *Foster Pepper, PLLC*), for intervenor Northwest Dairy Association.

*Bridget A. Baker-White* and *Richard A. Smith* on behalf of Waterkeeper Alliance, Columbia Riverkeeper, Puget Soundkeeper, and North Sound Baykeeper, amici curiae.

¶1 VAN DEREN, C.J. — This case involves the earnest and vigorous defense of pure groundwater for all citizens of Washington State. All involved parties operated with that goal during the hearings preceding this appeal. The Northwest Dairy Association (Association) and the Washington State Dairy Federation (Federation) are named as intervenors in the case and submitted briefs. The Waterkeeper Alliance, Columbia Riverkeeper, Puget Soundkeeper, and North Sound Baykeeper, as amici curiae, also submitted a brief.

¶2 The Community Association for Restoration of the Environment (CARE) appeals the decision of the Pollution Control Hearings Board (PCHB) affirming the general permit issued by the Washington Department of Ecology (Ecology) governing nitrate generation from dairies and other livestock operations. CARE specifically appeals the PCHB's determinations that (1) Ecology was not required to include groundwater monitoring as part of the permit and (2) the permit does not violate the federal Clean Water

Act's[1] requirement for public participation in the continuing protection of groundwater. We affirm the PCHB's decision allowing implementation of Ecology's general permit.

## FACTS

### I. THE PERMIT

¶3 Under the federal Clean Water Act, discharge of pollutants into state waters is prohibited.[2] 33 U.S.C. §§ 1251, 1311(a). Any discharge to navigable waters of the United States is unlawful unless the discharge is in accordance with a national pollution discharge elimination system permit. 33 U.S.C. §§ 1311(a), 1342(a). The federal Environmental Protection Agency (EPA) regulates pollution discharge permits, but the EPA may delegate this permit system to any state that requests such delegation. 33 U.S.C. § 1342(b). The EPA delegated this regulation to Washington State, and Ecology regulates the issuance of pollution discharge permits in the state. *See* WAC 173-226--030(5), -050(1). Ecology is authorized to issue general permits to groups of similar operations or organizations with similar types of discharge. WAC 173-226-050(3)(b).

¶4 In 2004, Ecology drafted a general permit covering dairy and other livestock operations, known as concentrated animal feeding operations (CAFOs).[3] CAFOs need pollution discharge permits because they apply animal manure con-

---

[1] Clean Water Act of 1977, Pub. L. No. 95-217, 91 Stat. 1566 (codified as amended in scattered sections of Title 33 U.S.C.).

[2] "In Washington, the water pollution control act[ ], chapter 90.48 RCW, implements the [Clean Water Act]." *Tukwila Sch. Dist. No. 406 v. City of Tukwila*, 140 Wn. App. 735, 739, 167 P.3d 1167 (2007).

[3] Not all animal feeding operations (AFOs) in the state are regulated under the CAFO general permit. Whether the permit applies to a particular AFO is "based on the number of animals present, whether there is a discharge to waters of the state, or whether Ecology has formally determined that an AFO is a significant contributor of pollutants to water of the state regardless of size." Clerk's Papers (CP) at 13. The permit "covers approximately 35 of the 507 licensed dairies and approximately five animal feedlots in the state." CP at 21.

taining nitrogen to crops for fertilization.[4] Nitrate nitrogen "poses the greatest risk to groundwater . . . because it is the most soluble form of nitrogen and moves most easily in water through soil." Clerk's Papers (CP) at 18.

¶5 The final permit "took effect on July 21, 2006, and will expire on . . . July 21, 2011."[5] CP at 12. The permit is what is referred to as a "no discharge" permit because it restricts CAFOs from discharging any pollutants into the waters of the state. Under the permit, CAFOs may not discharge any "manure, litter, or process wastewater into waters of the state" unless the discharge occurs as a result of extreme weather. CP at 13. In addition, though the permit allows CAFOs to apply animal waste to crops to provide certain nutrients, it prohibits CAFOs from causing field runoff by applying waste in excess of the amounts that can be absorbed by the crops. The permit, therefore, prohibits "field applications of manure [that] exceed agronomic rates." CP at 13. If any discharges do occur, the permit requires the CAFO "to minimize any discharge that may be authorized . . . and to take immediate action in response to unauthorized discharges." In addition, CAFOs must report any discharges to Ecology "as soon as possible but no later than 24 hours after the discharge." CP at 14. Discharges may be authorized if the CAFO "demonstrate[s] to the satisfaction of [Ecology], prior to a discharge, that . . . [a]n overriding consideration of the public interest will be served" and also shows that "[a]ll contaminants proposed for

---

[4] Manure contains three forms of nitrogen: "ammonia and organic nitrogen, plus a relatively small amount of nitrate nitrogen. Growing crops typically prefer the nitrate form of nitrogen, but if more nitrate is available than can be used by plants, the excess nitrate may leach to groundwater." CP at 18.

[5] After the permit's release for official public comment in 2004, Ecology held four public hearings. In February 2005, the United States Court of Appeals for the Second Circuit issued a decision in *Waterkeeper Alliance, Inc. v. United States Environmental Protection Agency*, holding in part that the EPA's failure to require review and approval of nutrient management plans before issuing permits and its "fail[ure] to require that the terms of the nutrient management plans be included in [pollution discharge] permits" violated the Clean Water Act. 399 F.3d 486, 498-504 (2d Cir. 2005). In response to the *Waterkeeper Alliance* decision, Ecology redrafted the general permit. The permit was re-released for public comment, and three additional public hearings were held.

entry into said ground waters [have been] provided with all known, available, and reasonable methods of prevention, control and treatment prior to entry." Resp't's Ex. 1, at 1489.

¶6 As part of its permit application, a CAFO must submit a nutrient management plan that "conform[s] to the United States Department of Agriculture [USDA] Natural Resources Conservation Service Field Operation Technical Guide [technical guide]." The USDA technical guide is "a series of best management practices that are developed on a national scale and then each state has its own [technical guide] that [is] catered toward the requirements of each state."[6] Report of Proceedings (RP) (Apr. 30, 2007) at 189. "Once Ecology approves a [nutrient management plan], it becomes an enforceable part of the [p]ermit."[7] Br. of Resp't at 9.

¶7 In addition to the nutrient management plans, the permit requires annual soil monitoring. This monitoring must take place in the fall, after harvesting, so that CAFO operators can determine whether the appropriate amount of nitrate was applied to crops. If soil monitoring shows excess nitrate in the soil, the CAFO must submit an updated nutrient management plan to Ecology.

¶8 In conjunction with soil monitoring, the permit requires CAFOs to maintain storage lagoon areas for runoff and other waste. CAFOs must also maintain production areas, which include the animal confinement area, the manure storage area, the raw materials storage area, and

---

[6] Andrew Kolosseus of Ecology testified that EPA directed Ecology "to develop some sort of standards to base [nutrient management plans] on, and [Ecology] chose the [USDA technical guides] because they were the best national [best management practice] standards that [Ecology] had." Report of Proceedings (Apr. 30, 2007) at 190.

[7] The nutrient management plans must include "a field-specific assessment of the form, source, amount, timing, and method of application of nutrients on each field to achieve realistic production goals, while minimizing to the lowest achievable level nitrogen and phosphorus movement to surface and groundwater." Br. of Resp't at 10.

the waste containment area. The permit does not require soil monitoring of storage lagoons and production areas.[8]

¶9 But the permit requires CAFOs to "develop a process to anticipate the storage level of the manure lagoon," thereby allowing the CAFO to detect possible leakage. "When an inspection shows that the liquid is below the expected level, the facility must investigate immediately." If the CAFO finds that there is a leak in the lagoon, "the facility must take immediate action to stop the leak" and it must notify Ecology of the leak. Resp't's Ex. 1, at 1501. These systems must then be maintained through "[w]eekly inspections of manure, litter, and process wastewater impoundments." CP at 36. Production areas must be designed to divert clean water away from the production area and to divert any runoff from the production area into the storage lagoon so that it will not seep into the ground.

¶10 In addition to the submission of nutrient management plans to Ecology, the permit requires CAFOs to maintain "certain additional operational records on-site" and make these records "available upon request by Ecology and [the Department of] Agriculture." CP at 24. If a member of the public requests information, Ecology will request the information from the CAFOs. Under the permit, the CAFO must supply the information upon Ecology's request. Ecology may then determine on a "case-by-case" basis whether any of the requested information qualifies as a confidential business record and is, therefore, exempt from public disclosure.[9] CP at 49.

II. PROCEDURAL HISTORY

¶11 CARE appealed the permit to the PCHB. Both CARE and Ecology moved for summary judgment, and the

---

[8] The permit does not require facilities to conduct soil monitoring under lagoons "because it would be impossible to obtain a sample and would compromise the integrity of the liner." Br. of Resp't at 15.

[9] Melodie Selby, senior policy analyst for the water quality program at Ecology, testified that a system was being implemented to expedite public requests for information by processing all CAFO confidentiality claims immediately upon submission of records.

PCHB ruled in favor of Ecology on seven of the twelve issues CARE raised. The PCHB then conducted a hearing on the remaining five issues and affirmed the permit with the addition of one clarification. This clarification requires that, where "monitoring shows that water quality is at risk," the CAFO may not apply additional waste to fields "until after the [nutrient management plan] update required by [the permit] is approved." CP at 56.

¶12 On August 31, 2007, CARE filed a petition for review of the PCHB decision in Thurston County Superior Court. CARE challenged two of the PCHB's decisions. First, it challenged the PCHB's conclusion that it was reasonable for Ecology not to require groundwater monitoring. Second, CARE challenged the PCHB's conclusion that the permit satisfied the Clean Water Act's public participation requirement. CARE requested the following relief:

> 1. An order declaring that the provisions of the underlying permit set forth above are inconsistent with applicable law and overturning the portions of the Board's Findings of Fact, Conclusions of Law, and Order that are inconsistent with such order, and remanding the permit to the Board and/or the Department of Ecology for reissuance consistent with applicable law;
>
> 2. An award of litigation expenses under RCW 4.84.340 - .360 and/or RCW 4[ ].84.067;
>
> 3. Such other relief as the Court determines is just and reasonable.

CP at 7. The parties jointly moved for direct review by this court under RCW 34.05.518.

## ANALYSIS

I. STANDARD OF REVIEW

¶13 We review PCHB orders under the Washington Administrative Procedure Act, chapter 34.05 RCW. *Pub. Util. Dist. No. 1 of Pend Oreille County v. Dep't of Ecology*, 146 Wn.2d 778, 789-90, 51 P.3d 744 (2002); *see also* RCW

34.05.514(3), .518(1), (3)(a). Our review of the facts is limited to the record before the PCHB. RCW 34.05.558. We apply "the standards of review in RCW 34.05.570(3) directly to the agency record." *Postema v. Pollution Control Hearings Bd.*, 142 Wn.2d 68, 77, 11 P.3d 726 (2000); *Dep't of Ecology v. Theodoratus*, 135 Wn.2d 582, 589, 957 P.2d 1241 (1998). "The burden of demonstrating the invalidity of agency action is on the party asserting invalidity." RCW 34.05.570(1)(a).

¶14 On direct review, we may grant relief in three circumstances. *Port of Seattle v. Pollution Control Hearings Bd.*, 151 Wn.2d 568, 587-89, 90 P.3d 659 (2004). First, we may grant relief if we find that the PCHB's order is contrary to the law because it is (1) " 'outside the statutory authority or jurisdiction' " of the PCHB, (2) an erroneous interpretation or application of the law, or (3) inconsistent with an agency rule. *Port of Seattle*, 151 Wn.2d at 587-88 (quoting RCW 34.05.570(3)(b)). We conduct a de novo review of the agency's legal conclusions. *Fort v. Dep't of Ecology*, 133 Wn. App. 90, 95, 135 P.3d 515 (2006).

¶15 If a statute is within the agency's expertise, however, "the agency's interpretation of the statute is accorded deference, so long as that interpretation does not conflict with the statute's plain language." *Pub. Util. Dist. No. 1 of Clark County v. Pollution Control Hearings Bd.*, 137 Wn. App. 150, 157, 151 P.3d 1067 (2007).[10] If a PCHB order is found to be inconsistent with an agency rule, no relief should be granted if "the agency provides facts and reasons to demonstrate a rational basis for the inconsistency." *Port of Seattle*, 151 Wn.2d at 587-88.

¶16 Second, we may grant relief if we find that "the PCHB's order is 'not supported by evidence that is substantial when viewed in light of the whole record before the

---

[10] We have previously determined that because "[t]he legislature designated Ecology to regulate Washington's water code," Ecology should be given deference over the PCHB with regard to "interpretation of statutes and regulations dealing with water resources." But "we give deference to the PCHB's findings of fact." *Pub. Util. Dist. No. 1 of Clark County*, 137 Wn. App. at 157.

court.' " *Port of Seattle*, 151 Wn.2d at 588 (quoting RCW 34.05.570(3)(e)). "In reviewing an agency's findings of fact, this court has described the 'substantial evidence' test as whether the record contains 'a sufficient quantity of evidence to persuade a fair-minded person of the truth or correctness of the order.' " *Port of Seattle*, 151 Wn.2d at 588 (internal quotation marks omitted) (quoting *King County v. Cent. Puget Sound Growth Mgmt. Hearings Bd.*, 142 Wn.2d 543, 553, 14 P.3d 133 (2000)).

¶17 We overturn an agency's findings of fact "only if they are clearly erroneous and we are 'definitely and firmly convinced that a mistake has been made.' " *Port of Seattle*, 151 Wn.2d at 588 (citation omitted) (quoting *Buechel v. Dep't of Ecology*, 125 Wn.2d 196, 202, 884 P.2d 910 (1994)). "We do not weigh the credibility of witnesses or substitute our judgment for the PCHB's with regard to findings of fact." *Port of Seattle*, 151 Wn.2d at 588. Any unchallenged PCHB finding of fact is a verity on appeal. *Postema*, 142 Wn.2d at 100; *Patterson v. Superintendent of Pub. Instruction*, 76 Wn. App. 666, 674, 887 P.2d 411 (1994).

¶18 Third, we may grant relief if we find that the PCHB's order is " 'arbitrary or capricious.' " *Port of Seattle*, 151 Wn.2d at 589 (quoting RCW 34.05.570(3)(i)). Agencies act in an arbitrary or capricious manner when their action is "willful and unreasoning and taken without regard to the attending facts or circumstances." *Hills v. Dep't of Ecology*, 131 Wn.2d 373, 383, 932 P.2d 139 (1997). "Where there is room for two opinions, and the agency acted honestly and upon due consideration, this court should not find that an action was arbitrary and capricious, even though this court may have reached the opposite conclusion." *Port of Seattle*, 151 Wn.2d at 589.

II. SUBSTANTIAL EVIDENCE SUPPORTED THE PCHB's FINDING OF FACT 56

¶19 CARE argues that the PCHB partially based its conclusion that groundwater monitoring was not necessary on finding of fact 56, which finding of fact CARE argues was clearly erroneous.

¶20 Finding of fact 56 states:

Expert testimony was conflicting regarding the volume of specific discharge, and the resulting threat to groundwater, that can reasonably be expected from a "typical" waste storage facility covered by Washington's CAFO General Permit. We find the testimony of Ecology's and Intervenor's experts more credible on this point. CARE's expert's estimated discharge volumes were calculated using waste treatment facility standards (designed to infiltrate) rather than waste storage facility standards (designed to prevent infiltration), resulting in an unrealistically high estimate of leakage.

CP at 36.

¶21 CARE argues that "[t]his finding was based on erroneous conceptions about the design differences between waste storage facilities and waste treatment lagoons; the PCHB was under the mistaken impression that waste treatment standards were designed for infiltration while waste storage standards were not." Rather, CARE argues, "In both standards . . . the priority is to avoid infiltration of the waste into the underlying aquifer." CARE further notes that "the PCHB missed the overall point raised by Dr. Bell and not contradicted" by Ecology that "the annual leakage is in the range of hundreds of thousands to millions of gallons." Br. of Appellant at 34-35.

¶22 CARE's expert witness, Dr. Bruce Bell, "a board-certified environmental engineer," testified that soil monitoring is not sufficient to regulate discharge to the waters of the state. RP (May 2, 2007) at 672. He claimed that soil monitoring did not account for seepage from storage lagoons and that the only way to monitor for such seepage is through the use of wells for groundwater monitoring. He stated that the leaching rates for lagoons is 0.8 meters per year and that at such rates lagoons will account for leakage of 2.7 million gallons per year. But Bell admitted that he had not seen any data on the impact from CAFOs the current permit regulated.

¶23 Ecology's witness, Dr. Kevin Freeman, a hydro-geologist and environmental scientist, testified that "the

lack of groundwater monitoring in the general permit does not fail to protect water quality." RP (May 4, 2007) at 1079. He stated that groundwater monitoring is "not necessary for detecting leaking lagoons. You can detect leaking lagoons through a water balance. You can detect application to the fields through soil sampling." RP (May 4, 2007) at 1089. Freeman asserted that Bell used the wrong standard when estimating the amount of leakage from waste storage lagoons. On cross-examination, Freeman admitted that lagoons do leak and that the leaked water ultimately "[g]oes to groundwater." RP (May 4, 2007) at 1109.

¶24 We do not review the fact finder's credibility determinations. *Port of Seattle*, 151 Wn.2d at 588. In finding of fact 56, the PCHB found Ecology's expert more credible than CARE's expert with regard to the efficacy and need for groundwater versus soil monitoring. CP at 36 ("We find the testimony of Ecology's and Intervenor's experts more credible on this point."). Therefore, we defer to the PCHB's finding that Ecology's expert witness was more credible than CARE's expert witness and we do not further review finding of fact 56.

III. The PCHB's Conclusion of Law 25 Is Consistent with Chapter 90.48 RCW

¶25 CARE argues that the PCHB erred in concluding that the permit's failure to require groundwater monitoring is reasonable because it "does not protect the waters of the State in violation of [the Washington Pollution Control Act] and its implementing regulations." Br. of Appellant at 1. CARE does not specify under which portion of RCW 34-.05.570 it seeks relief regarding the PCHB's conclusion on the lack of groundwater monitoring in the general permit. Because CARE argues that the holding is inconsistent with chapter 90.48 RCW, we consider CARE's challenge under RCW 34.05.570(3)(h) to determine whether the PCHB's order is inconsistent with an agency rule or applicable statute.

¶26 CARE challenges PCHB conclusion of law 25, which states:

Ecology considered and rejected alternative monitoring requirements, including various groundwater monitoring options. It considered the costs along with environmental risks and benefits in reaching its conclusion to require soil monitoring and other conditions protective of groundwater in lieu of groundwater and/or surface water monitoring. Given the context of this permit as a "no discharge" permit, we conclude Ecology was reasonable in determining that regular surface water monitoring is not necessary to protect water quality. We further conclude that Ecology's decision not to require groundwater monitoring in the CAFO General Permit is reasonable in light of the complexity, site-specific nature, and limited environmental benefit to be gained relative to the likely costs of such a monitoring regime.

CP at 60. This is a mixed finding of fact and conclusion of law. CARE focuses on the conclusion that the CAFO permit is reasonable in not requiring groundwater monitoring; thus, we review this conclusion de novo. *Fort*, 133 Wn. App. at 95.

A. Chapter 90.48 RCW and Its Implementing Regulations, Chapter 173-200 WAC

¶27 CARE argues that "[b]ecause part of the anti-degradation policy of state water law requires that '[ ]degradation of ground water quality that would interfere with or become injurious to beneficial uses shall not be allowed,' Ecology's permit violates its legal responsibility by failing to account for the admitted pollution coming from CAFOs."[11] Br. of Appellant at 25 (quoting WAC 173-200-030(2)(a)).

¶28 CARE cannot point to a requirement for groundwater management in chapter 90.48 RCW, but it argues that interpretation of chapter 90.48 RCW should be liberally construed to effectuate its aim to protect the state's water. In doing so, CARE specifically points to evidence before the PCHB suggesting that soil monitoring fails to detect

---

[11] CARE argues that "Ecology concedes that CAFOs contaminate groundwater" and that "[e]arly in the permit development process, Ecology recognized groundwater monitoring as the legally mandated avenue to determine the nitrate contamination problem coming from CAFOs." Br. of Appellant at 25, 29.

groundwater contamination from storage lagoons or production areas. CARE argues that "Ecology's [p]ermit violates its legal responsibility by failing to account for the admitted pollution coming from CAFOs." Br. of Appellant at 25. CARE points to an Ecology "Frequently Asked Questions" document, Appellant's Ex. 46, at 5090, to show that Ecology originally considered groundwater monitoring "the legally mandated avenue." Br. of Appellant at 29.

¶29 The evidence relating to groundwater protection was disputed before the PCHB. As Ecology points out, "[t]here is no evidence that CAFOs in compliance with the Permit will contaminate groundwater." Furthermore, "CARE ignores the fact that the Permit specifically prohibits the types of discharges that would violate the anti-degradation policy. CARE has failed to prove that soil monitoring, in conjunction with the required lagoon leak detection mechanism and production area stormwater requirements, is not protective of surface and groundwater quality."[12] Br. of Resp't at 22-23 (citation omitted).

¶30 The Association argues that "groundwater monitoring would not be helpful to clean-up existing problems, and in fact . . . it would not serve to *prevent* groundwater pollution in any event." Br. of Intervenor Association at 22 (citation omitted). The Association further notes that "groundwater monitoring 'only shows what has happened in the past, what has gotten into the groundwater,' " while soil monitoring allows CAFOs to prevent groundwater pollution. Br. of Intervenor Association at 23 (quoting RP (May 1, 2007) at 405). Therefore, it argues, "Ecology reasonably concluded that soil monitoring would be more protective of the environment than groundwater monitoring." Br. of Intervenor Association at 23 (emphasis omitted).

---

[12] Ecology further notes that the current permit "replaced and expanded upon the state's previous Dairy General Permit, which expired in 2005." Br. of Resp't at 4. The previous CAFO general permit did not (1) require soil monitoring or lagoon leak detection mechanisms, (2) require CAFOs to submit nutrient management plans to Ecology for approval, (3) require CAFOs to route clean water away from production areas, or (4) include an express prohibition on discharges to groundwater. Br. of Resp't at 4.

The Federation points out that groundwater monitoring is not required by the federal Clean Water Act nor is it required under Washington law.

¶31  Here, we are not the fact finder. The issue of whether soil monitoring, lagoons, and diversion from production areas will protect groundwater is within Ecology's expertise. Ecology did include groundwater monitoring in an early draft of the permit, but it replaced groundwater monitoring with soil monitoring in the final permit. In conjunction with soil monitoring, the permit also includes requirements that CAFOs (1) implement lagoon leakage detection systems, (2) inspect lagoons for leakage,[13] and (3) divert clean water from production areas to prevent any runoff from these areas. All unavoidable runoff from production areas, such as runoff caused by rainfall, must be diverted to storage lagoons to prevent it from contaminating groundwater.

¶32  We review the applicable law to determine whether the PCHB failed to comply with its governing laws and regulations. RCW 90.48.010 states that "[i]t is . . . the public policy of the state of Washington to maintain the highest possible standards to insure the purity of all waters of the state consistent with public health and public enjoyment thereof, the propagation and protection of wild life, . . . and the industrial development of the state[14] and to . . . require the use of all known available and reasonable methods by industries and others to prevent and control the pollution of the waters of the state of Washington."

¶33  Chapter 90.48 RCW and chapter 173-200 WAC do not expressly require groundwater monitoring to protect the state's waters. Thus, the PCHB's conclusion of law that "the CAFO General Permit is reasonable in light of the complexity, site-specific nature, and limited environmental

---

[13] "If a CAFO discovers a leak, the permittee must notify Ecology within 24 hours and take immediate action to stop the leak." Br. of Resp't at 15.

[14] CARE's brief does not include the final portion of the statement, regarding the industrial development of Washington state.

benefit to be gained relative to the likely costs of such monitoring regime" does not violate the applicable law and CARE's challenge fails. CP at 60.

B. Ecology's Permit Was Based on Permissible Factors

¶34 CARE also argues that Ecology impermissibly considered factors such as the cost of groundwater monitoring, pressure from the regulated industry, and the burden on Ecology resources when drafting the final permit. First, CARE argues that Ecology considered the "viability of the CAFO industry" without "conduct[ing] an economic analysis of the financial impacts on CAFOs should groundwater monitoring be required." CARE also argues that Ecology was "unduly concerned with the CAFO Industry's agreement with the permit terms." Br. of Appellant at 37-38. Finally, CARE argues that "workload for Ecology was improperly considered in developing the Permit." Br. of Appellant at 36.

¶35 As noted above, RCW 90.48.010 not only requires Ecology to "maintain the highest possible standards to insure the purity of all waters of the state" but also requires that it do so in a manner that is "consistent with . . . the industrial development of the state." RCW 90.48.010. Furthermore, Division One of this court has held that "the [Washington Pollution Control Act] also requires that this policy be consistent with several other state policies, including those promoting industrial development." *Puget Soundkeeper Alliance v. State*, 102 Wn. App. 783, 789, 9 P.3d 892 (2000). It was, therefore, not impermissible for Ecology to consider the burden on the regulated industry in drafting the permit.

¶36 With regard to Ecology's alleged concern with the industry's approval of the final permit, there is evidence in the record that the industry was opposed to both soil monitoring and groundwater monitoring. The record does not support CARE's allegation that Ecology gave too much weight to the opinion of the industry since the permit requires soil monitoring, and other reporting and record keeping, and makes the records publicly available.

¶37 Finally, CARE does not point to any portion of chapter 90.48 RCW that supports its contention that it was impermissible for Ecology to consider the burden on its own resources. CARE relies on *Headwaters, Inc. v. Talent Irrigation District*, in which the Ninth Circuit contrasts the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), 7 U.S.C. §§ 136-136y, with the Clean Water Act. 243 F.3d 526, 532 (9th Cir. 2001). *Headwaters* states that "the granting of a [pollution discharge] permit under the [Clean Water Act]," unlike FIFRA, "is not based on a cost-benefit analysis, but rather on a determination that the discharge of a pollutant satisfies the EPA's effluent limitations, imposed to protect water quality." 243 F.3d at 532. Therefore, CARE argues, "Ecology incorrectly made an undocumented, arbitrary cost-benefit analysis in determining how to monitor compliance with groundwater standards." Br. of Appellant at 36. But here, because we hold that the permit satisfies the requirements of chapter 90.48 RCW and sufficiently protects the state's water, there is no support for CARE's argument that Ecology considered the burden on its resources instead of considering the state's water quality.

¶38 CARE has not shown that the PCHB's conclusion that the permit need not contain groundwater monitoring is inconsistent with chapter 90.48 RCW or its implementing regulations, and CARE's challenge fails.

IV. PUBLIC PARTICIPATION IS PROTECTED UNDER THE CAFO GENERAL PERMIT

¶39 Finally, CARE argues that the PCHB erred in ruling that the permit "complies with the Clean Water Act's requirement that Ecology assure meaningful public participation in the development and enforcement of relevant effluent limitations." Br. of Appellant at 41. CARE makes two arguments regarding public access. First, it argues that the permit impermissibly allows for redaction of vital information from nutrient management plans and, second, it argues that the permit impermissibly allows Ecology to

redact information from CAFOs' reports on a case-by-case basis.

¶40 Ecology argues that "[t]he Clean Water Act protects from disclosure documents that 'if made public would divulge methods or processes entitled to protection as trade secrets.' " Br. of Resp't at 39 (quoting 33 U.S.C. § 1318(b)(2)). Ecology further argues that "[t]he Board correctly concluded that Ecology's implementation of the confidential business records exemption on a case-by-case basis was not only reasonable but a requirement of state law." Br. of Resp't at 39-40. Here, we must determine whether the PCHB "erroneously interpreted or applied the law." RCW 34.05.570(3)(d).

## A. Nutrient Management Plan Information

¶41 The Clean Water Act requires that "[p]ublic participation in the development, revision, and enforcement of any regulation, standard, *effluent limitation*, plan, or program . . . shall be provided for, encouraged, and assisted by the Administrator and the States." 33 U.S.C. § 1251(e) (emphasis added). Furthermore, *Waterkeeper Alliance, Inc. v. United States Environmental Protection Agency* determined (1) that effluent limitations are "any restriction established by a State . . . on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources" and (2) that "under the CAFO Rule, the only restrictions actually imposed on land application discharges are those restrictions imposed by the various terms of the nutrient management plan." 399 F.3d 486, 502 (2d Cir. 2005) (emphasis omitted) (quoting 33 U.S.C. § 1362(11)). Therefore, the Clean Water Act requires that public participation in the enforcement of the CAFO nutrient management plans be "provided for, encouraged, and assisted" by Ecology. 33 U.S.C. § 1251(e).

¶42 Nutrient management plans are "effluent limitations under the permit," RP (May 1, 2007) at 411, and are "public records that any member of the public can request

from Ecology" at any time. Br. of Resp't at 38. The Federation notes that Ecology amended the CAFO permit to require that nutrient management plans be submitted as part of the application process and that they be part of the permit, in compliance with *Waterkeeper Alliance*. The Federation further notes that the nutrient management plans "are available for public review" under the permit and that "the [nutrient management plans] include effluent limitations." Br. of Intervenor Federation at 32.

¶43 Because there is agreement that the nutrient management plans constitute effluent limitations, we must determine whether the PCHB erroneously interpreted the law in allowing Ecology to redact information from the nutrient management plans.

B. Redactions by Ecology from Nutrient Management Plans for Operational Records

■ ¶44 RCW 43.21A.160 states that "[w]henever any records or other information" supplied to Ecology "relate to the processes of production unique to the owner or operator thereof, or may affect adversely the competitive position of such owner or operator if released to the public or to a competitor, the owner or operator . . . may so certify, and request that such information or records be made available only for the confidential use of [Ecology]." Once Ecology receives such a certification from an owner or operator, the statute requires that Ecology "give consideration to the request, and if such action would not be detrimental to the public interest and is otherwise within accord with the policies and purposes of this chapter," Ecology may grant the request. RCW 43.21A.160. Furthermore, the Clean Water Act includes a provision to protect documents from public access if the documents "would divulge methods or processes entitled to protection as trade secrets." 33 U.S.C. § 1318(b)(2).

¶45 CARE argues that "[t]he Permit . . . violates federal and state water pollution control laws by allowing redacted [nutrient management plans] to be used to fulfill permit

application requirements." Br. of Appellant at 22. It argues that the PCHB erred when it concluded that the permit makes nutrient management plans "available for public review" and further argues that without the redacted information, "citizens will not be able to determine whether observed CAFO activities are done pursuant to its [nutrient management plan] or in violation of that [nutrient management plan]." Br. of Appellant at 46-47. Amici add that nutrient management plans "cannot be exempt as [confidential business information] because they contain public effluent data." Br. of Amici Curiae at 11 (internal quotation marks omitted). Amici further note that "disclosure provisions are to be 'liberally construed and [their] exemptions narrowly construed.' " Br. of Amici Curiae at 10 (quoting RCW 42.56.030).

¶46 The permit lists the minimum requirements for all nutrient management plans.[15] The portions that could be redacted from nutrient management plans under the operational records exemption "include site-specific engineering calculations for the design of lagoon waste storage facilities and field-specific calculations of agronomic application rates." CP at 25. "Only Ecology, [the Department of] Agriculture, and the permittee will have access to any redacted information contained in the records." CP at 26.

¶47 The PCHB found that the identified redacted information could be helpful to the public in certain ways[16] but that "[t]his type of detailed information is not essential for

---

[15] Furthermore, nutrient management plans for all CAFOs that are dairies "must also meet the minimum elements for nutrient management planning established by the Washington Conservation Commission under RCW 90.64-.026(2) or other agency designated by the legislature." Resp't's Ex. 1, at 1496.

[16] The PCHB specifically found that

[d]etailed best management practices implementation schedules would help citizens know the nature and timing of various CAFO nutrient management activities. Specific lagoon engineering calculations would allow citizens to know how much waste storage is available, how it is available, and to compare anticipated seepage rates against actual lagoon levels. Field-specific agronomic rate calculations would allow citizens to cross check the calculation against a CAFO's irrigation water management plans.

CP at 26-27.

evaluating a possible citizen enforcement action when there are clear discharges occurring in a 'no discharge' situation, but it would help in evaluating less-clear situations." CP at 27. The PCHB concluded that "[t]he permit provides for public participation in the development, revision, and enforcement of the standards, effluent limits, and plans connected with these [pollution discharge] permits by making Nutrient Management Plans publicly available for review as part of the permit application and coverage decision process."[17] CP at 49.

¶48 There is no language in the Clean Water Act or elsewhere requiring that nutrient management plans contain information not related to effluent limitations. *See* 33 U.S.C. §§ 1251, 1311, 1342. Where an agency has particular expertise, the reviewing court does not replace its interpretation of a statute for that of the agency. *Pub. Util. Dist. No. 1 of Clark County*, 137 Wn. App. at 157. RCW 43.21A.160 explicitly grants Ecology the ability to determine what constitutes confidential business information. Therefore, we defer to Ecology regarding the implementation of mechanisms for considering requests from CAFOs for redaction of certain information in nutrient management plans. The PCHB did not err in its application and interpretation of the Clean Water Act in approving the general permit that gives Ecology the discretion to allow redaction of operational or other information tangential to the enforcement of the permit from nutrient management plans.

## C. Future CAFO Report Redactions

¶49 CARE further argues that Ecology should not be able to redact information from future CAFO reports. It argues that "[t]he record establishes that Ecology administers citizen requests for CAFO records with great sensitivity to industry claims of confidentiality but without equivalent

---

[17] The PCHB further stated, "We are not persuaded that operational records are either effluent limits or otherwise the functional equivalent of permits such that they should be treated, categorically, the same as nutrient management plans under *Waterkeeper Alliance*." CP at 49-50.

regard for meaningful public participation." Br. of Appellant at 44. CARE argues that "the [p]ermit does nothing to prevent CAFOs from 'misunderstanding or misrepresenting' that such records are confidential and so not subject to public disclosure." Br. of Appellant at 44 (internal quotation marks omitted) (quoting *Waterkeeper Alliance*, 399 F.3d at 500). Amici argue that "decisions as to what types of information constitute [confidential business information] should not be made on an ad hoc basis" because "[t]o do so violates public interest." Br. of Amici Curiae at 12.

¶50 Ecology argues that "[i]n requesting a remand order directing Ecology to put a condition in the permit that requires disclosure of all operational and compliance records, CARE is asking this [c]ourt to issue a declaratory ruling. . . . If CARE believes Ecology's production of public records is untimely or inadequate, the Public Records Act provides the appropriate remedy." Br. of Resp't at 40. Ecology further states, "The fact that some documents created by some CAFOs may contain confidential information protected from disclosure under both state law and the Clean Water Act does not impermissibly interfere with the public's right to have access to appropriate facility documents." Br. of Resp't at 42.

¶51 The Federation argues that CARE's "real concern regarding access to public information is how Ecology will apply the confidential business records exception . . . to future public records requests" and, therefore, "[t]his concern is not ripe for review." Br. of Intervenor Federation at 37-38. The Federation further notes that "Ecology's regulation makes clear that the type of information that may be protected from disclosure [under the confidential business information exception] is information 'other than information on the effluent.' " Br. of Intervenor Federation at 35. The Association argues that "[i]f CARE makes a request for records under the Public Records Act . . . and if Ecology denies the request based on [confidential business information], CARE may seek judicial review of that denial." Br. of Intervenor Association at 42 (emphasis omitted).

¶52 Though there is evidence in the record that members of the public experienced long delays in response to public record requests in the past, Melodie Selby testified that Ecology has now created a system for expediting requests for information in the future. The PCHB concluded that "CARE has failed to prove that the permit's . . . public disclosure scheme unlawfully denies the public adequate information to participate meaningfully in permit coverage decisions." CP at 49. It further stated that "CARE is less concerned with where the records are kept than with how it anticipates Ecology will apply the confidential business records . . . exception in response to public records requests." PCHB stated, "We decline to engage in the kind of declaratory ruling CARE seeks." CP at 50.

¶53 As the PCHB noted, any consideration of how Ecology will address future confidential business information requests would be a declaratory ruling. There is no evidence in the record that Ecology has improperly applied its case-by-case consideration of confidential business information requests under the permit to date. Again, as the PCHB noted, "[I]f Ecology's administration of this permit provision results in untimely, inadequate, or impermissible disclosures, the affected parties have adequate alternative remedies available." CP at 52.

¶54 We agree with the PCHB that how Ecology applies its authority to redact requested public records in the future is not ripe for review, and we decline the invitation to issue a declaratory ruling.

¶55 We affirm the PCHB's decision approving Ecology's CAFO general permit.

HOUGHTON and HUNT, JJ., concur.