# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| SPOKANE COUNTY; STATE OF WASHINGTON; DEPARTMENT OF ECOLOGY, | No. 47158-2-II |
| Appellants, | |
| v. | UNPUBLISHED OPINION |
| SIERRA CLUB, and CENTER FOR ENVIRONMENTAL LAW & POLICY, | |
| Respondents. | |

MELNICK, J. — This case arises out of a permit issued by the Department of Ecology (Ecology) to Spokane County for the Spokane Regional Water Reclamation Facility (the Facility). It centers on whether Ecology took the proper steps under the National Pollution Discharge Elimination System (NPDES) permitting process to ensure the discharge from the Facility did not contain unsafe Polychlorinated Biphenyls (PCB) levels. The Sierra Club and the Center for Environmental Law and Policy (collectively Sierra Club) appealed the NPDES Permit. The Pollution Control Hearing Board (PCHB) concluded that portions of the Permit were invalid and remanded to Ecology. Spokane County and Ecology appealed the PCHB's conclusions of law and order of remand to Thurston County Superior Court. The superior court affirmed the PCHB. Spokane County and Ecology now seek review.

We hold that the PCHB properly decided Ecology should have conducted a reasonable potential analysis. However, we also conclude that the PCHB acted contrary to the law by performing its own reasonable potential analysis and determining the Facility had a reasonable potential to cause or contribute to a violation of water quality standards for PCB levels in the Spokane River. Independent of the PCHB's own analysis, because Ecology should have conducted a reasonable potential analysis, we conclude that remand was proper. We affirm in part, reverse in part, and remand.[1]

## FACTS

The Federal Clean Water Act establishes water quality goals for the United States' navigable waters. 33 U.S.C. § 1251. The NPDES is one mechanism for achieving these goals. 33 U.S.C. § 1342. The Clean Water Act prohibits any discharge of pollutants into the nation's navigable waters, unless the discharge is made according to the terms of a permit issued under the NPDES. 33 U.S.C. §§ 1311(a), 1342. The Environmental Protection Agency (EPA) authorized Washington State to manage the NPDES permit program in the state. *See* RCW 43.21A.020; WAC 173–226–030(5), –050(1). The Washington State Legislature delegated this authority to Ecology. RCW 43.21A.020; ch. 90.48 RCW.

---

[1] In addition to the issues we review in this opinion, Ecology also assigns error to the superior court's affirmation of the PCHB's decision. However, we take the place of the superior court when reviewing a PCHB order. *Patterson v. Segale*, 171 Wn. App. 251, 257-58 n.3, 289 P.3d 657 (2012). Furthermore, Ecology does not brief the issue. Therefore, we do not review this assignment of error. RAP 3.3; *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).

I.      THE FACILITY AND PERMIT

In 2011, Spokane County completed construction of the Facility, a state of the art wastewater tertiary treatment plant.[2]   In phase 1, which began when the Facility opened, the Facility was projected to process between 7 and 8 million gallons of water per day.  The Facility is projected to handle up to 12 million gallons of water per day by the year 2030 and 24 million gallons of water per day at its maximum capacity.  Prior to its construction, Riverside Park Water Reclamation Facility processed wastewater in Spokane County.  With the new technology utilized by the Facility, it is expected to achieve higher PCB removal from the effluent discharges.[3]   The Facility's treatment technology will "reduce the discharge of PCBs to the Spokane River at potentially undetectable levels."  Clerk's Papers (CP) at 24.

In September 2010, Spokane County applied for a NPDES permit for the Facility, and in November 2011, Ecology issued the Permit.  The Permit's effective date is December 1, 2011, and its expiration date is November 31, 2016.  In December 2011, the Facility began discharging treated effluent in compliance with the Permit.  The Facility does not discharge to a part of the Spokane River that is on the 303(d) list.[4]  Pub. L. No. 92-500, § 303(d), 86 Stat. 816, 848-49 (1972) (codified as amended at 33 U.S.C. § 1313(d)).

---

[2] A tertiary treatment process incorporates a "step-feed nitrification/denitrification membrane bioreactor with chemical phosphorus removal" and several other key components.  Administrative Record (AR) at 272.

[3] PCBs are "legacy pollutants that continue to persist in the environment."  Clerk's Papers (CP) at 18.  PCBs are in wastewater and are also introduced into the environment from other, sometimes unidentified, sources.

[4] The 303(d) list includes those waters not meeting Washington State human health water quality criteria for PCBs in edible fish tissue.  33 U.S.C. § 1313(d)(1)-(2).  Classification under the 303(d) list triggers different requirements, such as a Total Maximum Daily Load assessment.  33 U.S.C. § 1313(a)(l); *see* 40 C.F.R. § 122.44(a), (l).

47158-2-II

A water quality specialist for Ecology, Richard Koch, reviewed the application, prepared a Fact Sheet,[5] and prepared the Permit. The Fact Sheet stated that Ecology evaluated the Facility's potential to violate the water quality standards as required by 40 C.F.R. § 122.44(d). It followed the procedures published in two guidance documents[6] to make a reasonable potential determination.

Koch did not estimate a specific PCB concentration for the Facility discharge. According to Koch, insufficient data on PCBs existed to conduct a reasonable potential analysis[7] and to determine if a reasonable potential existed for the effluent discharge to contribute to violations of

---

[5] A Fact Sheet is a document prepared by Ecology and includes information about the type of facility, the geographical area, the criteria for which coverage under the general permit will be approved, effluent characteristics, effluent standards and limitations applied, and other information. WAC 173-226-110.

[6] The Office of Water, U.S. Envtl. Prot. Agency, *Technical Support Document for Water Quality-Based Toxics Control* (Mar. 1991) (EPA/505/2-90-001), https://www3.epa.gov/npdes/pubs/owm0264.pdf, (TSD), and Ecology's Wash. Dep't of Ecology, *Water Quality Program Permit Writer's Manual* (rev. Dec. 2011) (Pub. No. 92-109) (Permit Writer's Manual).

[7] According to Koch a "reasonable potential analysis" is

> a tool to provide first an estimate of the concentrations of a pollutant at the edge of the mixing zone. It's basically using the dilution provided by the river of the effluent discharged from the treatment plant. Numbers you need, obviously, the flow in the river, the concentration upstream, and the concentration coming out of the treatment facility. They both meet in the mixing zone, they combine, they mix, and the model is designed to project what that combined concentration would be downstream at the edge of the mixing zone.

RP (March 25, 2013) at 120-21.

4

the PCB criteria. The Permit did not include numeric permit limitations for PCBs.[8] Koch drafted permit conditions utilizing best management practices and narrative effluent limitations, or narrative criteria.[9]

One condition of the Permit required Spokane County to prepare an "Annual Toxics Management Report" that Ecology would review and approve. CP at 27-28. As a part of the condition, Ecology also required Spokane County to prepare a "Quality Assurance Project Plan" that detailed water quality sampling and analyzed protocols. CP at 30. Samples were to be analyzed using EPA Method 1668, a method that was not approved for compliance purposes, but was approved for monitoring purposes.[10]

The Permit provided that in the next permitting period, Ecology would conduct a reasonable potential analysis from the data collected during the first permit. It would then establish a numeric effluent limit. Koch asserted that similar permit conditions had been used in the NPDES

---

[8] According to the Clean Water Act, an "effluent limitation" is "any restriction established by a State or the Administrator on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources into navigable waters, the waters of the contiguous zone, or the ocean, including schedules of compliance." 33 U.S.C. § 1362(11). The federal regulation specifies that an "[e]ffluent limitation means any restriction imposed by the Director on quantities, discharge rates, and concentrations of 'pollutants' which are 'discharged' from 'point sources' into 'waters of the United States,' the waters of the 'contiguous zone,' or the ocean." 40 C.F.R. § 122.2.

[9] Best management practices are to control or abate the discharge of pollutants when numeric effluent limitations are infeasible. 40 C.F.R. § 122.44(k). According to the TSD, "[N]arrative criteria are statements that describe the desired water quality goal, such as the following: 'All State waters must, at all times and flows, be free from substances that are toxic to humans or aquatic life.'" AR at 2638.

[10] EPA Method 1668 is a means of assessing compliance and offers lower detection and quantification levels for surface water monitoring of PCBs than other methods. However, the approved analytical method for surface water monitoring of PCBs at the time this Permit was challenged was EPA Method 608, not Method 1668. EPA Method 1668 was only approved for monitoring.

permits for other dischargers into the Spokane River. The permits for each NPDES discharger in Washington's section of the Spokane River have narrative effluent limitations.

The Fact Sheet stated, "The Task Force and Ecology's 'Spokane River Toxics Reduction Strategy' are intended to avoid the need for a PCB [Total Maximum Daily Load assessment] and initiate source reduction and clean up actions sooner than if a [Total Maximum Daily Load assessment] came first." Administrative Record (AR) at 1532. Further, it stated, "If the proposed Task Force approach is not successful, other means and methods will be employed including the option of a PCB [Total Maximum Daily Load assessment]." AR at 1532.

II.     THE PCHB HEARING

Sierra Club appealed the Permit to the PCHB on December 28, 2011, arguing that the Permit authorized PCB discharges that would cause or contribute to a violation of water quality standards, including violations of 40 C.F.R. § 122.44.

In March 2013, the PCHB held a hearing on Sierra Club's appeal of the Permit. During the hearing, Sierra Club, Spokane County, and Ecology presented testimony from several experts and interested parties. The expert witnesses included Koch, Peter deFur, and Bruce Rawls called by Sierra Club, as well as Jim Bellatty and Khalil Abusaba called by Spokane County and Ecology.

The parties also introduced two reports at the hearing upon which the expert witnesses relied. The first was a draft report that resulted from Ecology's Total Maximum Daily Load assessment for PCBs in the Spokane River in 2003-2004. The second report, entitled the "Spokane River PCB Source Assessment 2003-2007" (Source Assessment), issued in April 2011. In that report, Ecology estimated that PCB load reduction in excess of 99 percent by municipal, industrial, and stormwater discharges would be needed for compliance with human health criterion

6

for PCBs. The Source Assessment relied in part on the 2003-2004 data collection from the first report.

Koch testified that at the time of the hearing, based on recent reports, he understood the Facility was achieving 99 percent removal of PCBs. deFur testified that lab results from tests of the Facility showed how many PCBs were in the influent and one assessment showed the percentage removal of PCBs was about 98 percent. He stated, "It's remarkable. I know that in other areas where technical committees have been looking to see what can be done about that, they would have said it's not possible." Report of Proceedings (RP) (March 26, 2013) at 277. Abusaba testified that "we can't tell the difference between effluent and ultra purified laboratory water." RP (March 27, 2013) at 576.

Abusaba also stated, "Koch was right, the discharge of effluent from the membrane bioreactor system will not cause a measurable change in PCB concentrations of the river." RP (March 27, 2013) at 577. He clarified that while the discharge might actually be diluting the concentration of PCBs in the water, "I would not want to make a statement [in] either direction because we are beyond the limits of quantitation, and since we are below the limits of quantitation, how can we say that there is a measurable change in concentrations or loads?" RP (March 27, 2013) at 616. He went on to state, "We are not at a level in these measurements we're making that we can make quantitative statements about the concentrations of PCBs." RP (March 27, 2013) at 616. He stated the data was sufficient to show Koch's judgment call that the PCB level would be extraordinarily low was correct.

Koch testified that he did not perform a reasonable potential analysis for PCBs because insufficient data existed to perform the analysis. Specifically, no monitoring of PCBs through the kind of filter used by the Facility had occurred previously. When asked whether he was aware of

and considered the Department of Health's fish advisory for Spokane County while drafting, he stated that he did not because fish migrate and therefore, "may or may not demonstrate" reasonable potential. RP (March 25, 2013) at 73. He stated he looked at existing toxic pollutants but did not consider the assessment's conclusion in conducting a reasonable potential analysis. According to Koch, the two data points acquired by the time of the PCHB hearing were not adequate to conduct an analysis.

During his testimony, Koch also referred to a recent decision of the EPA in Idaho in a comparable situation.[11] In response to a comment during the open comment period, the EPA in Idaho stated it had determined that "it is currently infeasible to calculate numeric water quality-based effluent limits for PCBs . . . due to lack of data." AR at 1536. It also stated, "The lack of data also prevents the EPA from determining whether the Idaho publicly owned treatment works [] have the reasonable potential to cause or contribute to excursions above any of the affected jurisdictions' water quality standards for PCBs." AR at 1536. Finally, the EPA stated, "None of the [NPDES] permits for [publicly owned treatment works] discharging to the Spokane River in Idaho or Washington have numeric effluent limits for PCBs. . . . [BMPs] may be required in lieu of numeric effluent limits when numeric effluent limits are infeasible or when they are reasonably necessary to carry out the purposes and intent of the Clean Water Act." AR at 1536.

Koch was asked to explain why in the Fact Sheet, he wrote, "The evaluation showed that the discharge has no reasonable potential other than PCBs to cause a violation of water quality standards." AR at 1530. Koch explained that this statement did not mean he found a reasonable potential for PCBs; instead, it meant "there is insufficient data on PCBs to make that determination.

---

[11] The EPA is the regulatory agency in Idaho.

So [he] [couldn]'t say there's reasonable potential, no reasonable potential, if [he] d[i]dn't have data to make that determination." RP (March 25, 2013) at 71.

The PCHB issued findings of fact and conclusions of law in July 2013. The PCHB found that Ecology had access to information that a regulatory authority could consider when performing a reasonable potential analysis. It found that Ecology had information about the type of facility, the available dilution for the effluent, the existing data on toxic pollutants, the State's list of waters not meeting water quality standards, and fish advisories or bans. The PCHB also found that Koch testified he was aware of the fish advisory but did not consider the information pertinent because fish migrate and that Koch testified he did not use information already collected about Spokane River because he wanted more recent data. Further, the PCHB found that Koch testified he did not rely on the existing data on toxic pollutants because he did not have monitoring data on PCB removal from a tertiary treatment process and "it would be too speculative to include load reduction in the Fact Sheet." CP at 27.

The PCHB concluded "Ecology should have used this data to conduct a reasonable potential analysis for PCBs." CP at 36. It also concluded that "the evidence presented support[ed] the conclusion that there is a reasonable potential for the discharge from the Facility to cause or contribute to a violation of water quality standards." CP at 37.

The PCHB concurred with Koch and concluded that inadequate data existed to prepare a numeric effluent limit for PCBs. It wrote, "The [PCHB] defers to the technical expertise of Ecology on this matter and accepts [Koch's] conclusion that calculation of a numeric effluent limit for PCBs was not feasible." CP at 37. It also concluded that one permit condition failed as a narrative effluent limitation for lack of defined and mandatory language, as well as deadlines.

9

The PCHB remanded the Permit to Ecology with directions to incorporate deadlines, mandatory requirements, expected reductions, and additional sampling rounds. The PCHB directed Ecology to set numeric effluent limitations at the "earliest possible time, including during the term of the current permit." CP at 41.

Sierra Club filed a motion for reconsideration seeking modification of the Permit to "expressly prohibit discharges that cause or contribute to violations of all applicable water quality standards related to PCBs." AR at 2248. The PCHB denied the motion, and in August 2013, entered a final order.

III.    SUPERIOR COURT REVIEW

Ecology and Spokane County petitioned Thurston County Superior Court for review of the PCHB's findings of fact and conclusions of law and final order. Both Ecology and Spokane County argued the PCHB erred by concluding that Ecology should have conducted a reasonable potential analysis and by concluding that the evidence demonstrated that the Facility had a reasonable potential to cause or contribute to a violation of water quality standards.

The superior court heard argument in October 2014. It concluded that "the PCHB did not erroneously interpret and apply the law" and affirmed the PCHB. CP at 47. On January 9, 2015, the superior court issued an order affirming the PCHB.

Ecology and Spokane County appeal.

ANALYSIS

I.    STANDARDS OF REVIEW

We review a PCHB decision under the Washington Administrative Procedures Act, chapter 34.05 RCW. *Cornelius v. Dep't of Ecology*, 182 Wn.2d 574, 584-85, 344 P.3d 199 (2015). We sit in the same position as the superior court. *Patterson v. Segale*, 171 Wn. App. 251, 257-58 n.3,

10

289 P.3d 657 (2012); *see also* RCW 34.05.526 ("An aggrieved party may secure appellate review of any final judgment of the superior court under this chapter by the supreme court or the court of appeals."). Review of the facts is confined to the record before the PCHB, and we apply the Washington Administrative Procedures Act standards directly to that record. *Port of Seattle v. Pollution Control Hr'gs Bd.*, 151 Wn.2d 568, 587, 90 P.3d 659 (2004). The burden to demonstrate invalid agency action is on the party asserting the challenge, here Spokane County and Ecology. RCW 34.05.570(1)(a); *Port of Seattle*, 151 Wn.2d at 587.

The legislature designated Ecology to regulate the state's water resources. RCW 43.21A.020. Ecology is the state's water pollution control agency, and it reviews NPDES permit applications, prepares Fact Sheets, and issues NPDES permits. RCW 90.48.260(1); WAC 173-220-010, -040, -060; *Cmty. Ass'n for Restoration of Env't v. Dep't of Ecology*, 149 Wn. App. 830, 835, 205 P.3d 950 (2009). "The scope and standard of the PCHB review is de novo." *Port of Seattle*, 151 Wn.2d at 592. The PCHB reviews NPDES permits to determine if Ecology issued a permit that is "invalid in any respect." RCW 43.21B.110.

If the PCHB makes this determination, it "shall order the department to reissue the permit as directed by the [PCHB] and consistent with all applicable statutes and guidelines of the state and federal governments." WAC 371-08-540(2). In this case, we may grant relief on review of the PCHB (1) if PCHB's order is contrary to the law, (2) if the order is not supported by substantial evidence, and (3) if the order is arbitrary and capricious. *Cmty Ass'n for Restoration of Env't*, 149 Wn. App. at 840-41. In their appeal, Spokane County and Ecology rely on the first and third prongs.

An order is contrary to the law if it is outside of PCHB's statutory authority or jurisdiction, is an erroneous interpretation or application of the law, or is inconsistent with agency rule. *Cmty Ass'n for Restoration of Env't*, 149 Wn. App. at 840. The courts are the "'final arbiter[s]'" of conclusions of state law and are not bound by agency interpretation of these laws. *City of Redmond v. Cent. Puget Sound Growth Mgmt. Hr'gs Bd.*, 136 Wn.2d 38, 46, 959 P.2d 1091 (1998) (quoting *Leschi Improvement Council v. Highway Comm'n*, 84 Wn.2d 271, 286, 525 P.2d 774, 804 P.2d 1 (1974)). We review the PCHB's legal conclusions de novo. *Fort v. Dep't of Ecology*, 133 Wn. App. 90, 95, 135 P.3d 515 (2006).

An agency acts in an arbitrary or capricious manner when its action is "'willful and unreasoning and taken without regard to the attending facts or circumstances.'" *Cmty. Ass'n for Restoration of Env't*, 149 Wn. App. at 841 (quoting *Hillis v. Dep't of Ecology*, 131 Wn.2d 373, 383, 932 P.2d 139 (1997)). Under this prong, even if reasonable opinions vary, we will not disrupt the PCHB's decision "[w]here there is room for two opinions, and the agency acted honestly and upon due consideration." *Port of Seattle*, 151 Wn.2d at 589.

A.      Reasonable Potential Analysis

Spokane County and Ecology argue the PCHB improperly applied the law by concluding Ecology "should have" conducted a reasonable potential analysis to determine whether PCBs from the Facility had a reasonable potential to cause or contribute to contamination of the Spokane River. Br. of Appellant (SC) at 18; Br. of Appellant (E) at 12. They contend that under the guidance provided by the EPA, Ecology had discretion to decide whether to conduct a reasonable potential analysis prior to issuing a NPDES permit without facility-specific data. Further, Spokane

12

County opines that the exercise of discretion here involved Ecology's expertise in administering water quality laws and involves scientific issues.[12] We disagree.

In reviewing a NPDES permit, the PCHB first assesses whether the permit provides reasonable assurances to protect water quality. *Port of Seattle*, 151 Wn.2d at 595. It may create additional conditions only after it concludes the permit is inadequate for this purpose. *Port of Seattle*, 151 Wn.2d at 595. The legislature empowered Ecology to oversee permit regulation. RCW 43.21A.020. Ecology's interpretations of water resource statutes and regulations are entitled to great weight, as long as the interpretation does not conflict with the plain language of the statutes and regulations. *Pub. Util. Dist. No. 1 of Clark County v. Pollution Control Hr'gs Bd.*, 137 Wn. App. 150, 157, 151 P.3d 1067 (2007). However, even if a PCHB order is found to be inconsistent with an agency rule, no relief should be granted if the '"[PCHB] provides facts and reasons to demonstrate a rational basis for the inconsistency."' *Cmty. Ass'n for Restoration of Env't*, 149 Wn. App. at 840 (quoting *Port of Seattle*, 151 Wn.2d at 587-88).

Here, Ecology interpreted several state and federal statutes and concluded that it did not need to conduct a reasonable potential analysis before it issued the initial permit because Koch determined insufficient data existed. The main regulation in question is contained in 40 C.F.R. § 122.44(d)(1), which provides,

> (i) Limitations must control all pollutants or pollutant parameters (either conventional, nonconventional, or toxic pollutants) which the Director determines are or may be discharged at a level which *will cause, have the reasonable potential to cause, or contribute to an excursion above any State water quality standard, including State narrative criteria for water quality.*

[12] Sierra Club argues that the majority of Spokane County's and Ecology's assertions revolve around substantial evidence for the PCHB's findings of fact. However, Spokane County and Ecology do not challenge any of the PCHB's findings of fact. They challenge only PCHB's conclusions of law and the resulting order. Applying the law to facts is a question of law and therefore, we review de novo. *Port of Seattle*, 151 Wn.2d at 588.

(ii) When determining whether a discharge causes, has the reasonable potential to cause, or contributes to an in-stream excursion above a narrative or numeric criteria within a State water quality standard, the permitting authority *shall* use procedures which account for existing controls on point and nonpoint sources of pollution, the variability of the pollutant or pollutant parameter in the effluent, the sensitivity of the species to toxicity testing (when evaluating whole effluent toxicity), and where appropriate, the dilution of the effluent in the receiving water.

(iii) When the permitting authority determines, using the procedures in paragraph (d)(1)(ii) of this section, that a discharge causes, has the reasonable potential to cause, or contributes to an in-stream excursion above the allowable ambient concentration of a State numeric criteria within a State water quality standard for an individual pollutant, *the permit must contain effluent limits for that pollutant*.

(Emphasis added).

The Wash. Dep't of Ecology, *Water Quality Program Permit Writer's Manual* (rev. Dec. 2011) (Pub. No. 92-109) (*Permit Writer's Manual*), relied on by Koch in preparing the Permit, interpreted this federal regulation, and stated, "Federal regulations require the permit manager to determine whether a discharge has a reasonable potential to violate water quality standards and if so to place a water quality-based effluent limit in the permit." AR at 2495. Further it stated, "To determine this, the permit manager must know the criteria, the background concentration, the point of compliance, design flows for the receiving water and effluent flow, how to deal with multiple pollutants and effluent variability and the process of developing an effluent limit." AR at 2495. The *Permit Writer's Manual* stated that "Ecology has adopted EPA's (1991) process of determining reasonable potential." AR at 2500. It also stated that it relies on the Office of Water, U.S. Envtl. Prot. Agency, *Technical Support Document for Water Quality-Based Toxics Control* (Mar. 1991) (EPA/505/2-90-001), https://www3.epa.gov/npdes/pubs/owm0264.pdf (TSD).

The TSD, also relied on by Koch, "is intended to support the implementation of the [Clean Water Act] water quality-based approach to toxics control" and qualifies this support by stating,

"As such, the recommendations and guidance found in [the TSD] are not binding and should be used by regulatory authorities with discretion." AR at 2606. The TSD provided very specific guidance for determining permit limits when no effluent monitoring data for the specific facility existed. It stated that "effluent *must* be characterized and the permitting authority *must* determine the need for permit limits to control the discharge. The purpose of effluent characterization is to determine whether the discharge causes, has the reasonable potential to cause or contributes to an excursion of numeric or narrative water quality criteria." AR at 2653 (emphasis added).

Further, it in part paraphrased and in part quoted 40 C.F.R. § 122.44(d)(1)(ii) stating, "[T]he regulatory authority is required to consider, at a minimum, existing controls on point and nonpoint sources of pollution, the variability of the pollutant or pollutant parameter in the effluent, the sensitivity of the involved species to toxicity testing (for whole effluent), and, where appropriate, the dilution of the effluent in the receiving water." AR at 2655. In the context of providing two options—setting a permit limit (1) without effluent monitoring data or (2) after effluent monitoring data—the TSD stated,

> If the regulatory authority so chooses, or if the circumstances dictate, the authority may decide to develop and impose a permit limit . . . prior to the generation of effluent data. Water quality-based permit limits can be set . . . based on the available dilution and the water quality criterion or the State standard in the absence of facility specific effluent monitoring data.

AR at 2656. It went on to state that "the regulatory authority can use a variety of factors and information where facility-specific effluent monitoring data are unavailable," which include but are not limited to dilution, type of industry, type of publicly owned treatment works, existing data on toxic pollutants, history of compliance problems and toxic impact, and type of receiving water and designated use. AR at 2656.

Finally, the TSD stated,

15

Regardless, the regulatory authority, if it chooses to impose an effluent limit after conducting an effluent assessment without facility-specific monitoring data, will need to provide adequate justification for the limit in its permit development rationale or in its permit fact sheet. A clear and logical rationale for the need for the limit covering all of the regulatory points will be necessary to defend the limit should it be challenged. In justification of a limit, **EPA recommends that the more information the authority can acquire to support the limit, the better a position the authority will be in to defend the limit if necessary**. In such a case, the regulatory authority may well benefit from the collection of effluent monitoring data prior to establishing the limit.

If the regulatory authority, after evaluating all available information on the effluent, in the absence of effluent monitoring data, is not able to decide whether the discharge causes, has the reasonable potential to cause, or contributes to, an excursion above a numeric or narrative criterion for whole effluent toxicity or for individual toxicants, the authority should require whole effluent toxicity or chemical-specific testing to gather further evidence. In such a case, the regulatory authority can require the monitoring prior to permit issuance, if sufficient time exists, or it may require the testing as a condition of the issued/reissued permit.

AR at 2657.

Ecology contends that the interpretation of federal regulations in the *Permit Writer's Manual* and the TSD gave it the choice to either conduct a reasonable potential analysis without facility specific data, or to wait and collect PCB data. While Ecology's interpretation of water resource statutes and regulations is afforded great deference, the interpretation cannot go against the plain language of the statutes and regulations. *Pub. Util. Dist. No. 1 of Clark County*, 137 Wn. App. at 157.

The federal regulation mandates that "[l]imitations *must* control all pollutants . . . which the [agency] determines are or may be discharged at a level which will cause, have the reasonable potential to cause, or contribute to an excursion above any State water quality standard." 40 C.F.R. § 122.44(d)(1)(i) (emphasis added). To make the determination, the agency "*shall* use procedures which account for existing controls on point and nonpoint sources of pollution, the variability of the pollutant or pollutant parameter in the effluent, the sensitivity of the species to toxicity testing

(when evaluating whole effluent toxicity), and where appropriate, the dilution of the effluent in the receiving water." 40 C.F.R. § 122.44(d)(1)(ii) (emphasis added). The plain language of the regulation does not grant Ecology discretion to delay a reasonable potential analysis entirely.

Further, the section of the TSD Ecology relied on, when read in full, did not provide Ecology discretion on whether to conduct the analysis, but instead afforded Ecology discretion in how it conducted the analysis. In context, the TSD stated that if the agency decided to conduct a reasonable potential analysis before it had collected facility-specific data, and after relying on the available information to conduct the analysis it could not reach a conclusion, the agency could issue a permit that required testing and data collection.

Spokane County argues that the TSD "*cautions* Ecology in [making a determination by reference to other information], and allows instead the course Ecology choose." Br. of Appellant (SC) at 20. However, this argument again takes the TSD language out of context. The TSD generally cautions against creating a permit limit before collecting facility-specific data, not against relying on the suggested factors. It recommends that the permitting authority be prepared to defend the limit and that it "may well benefit from the collection of effluent monitoring data *prior* to establishing the limit." AR at 2657 (emphasis added). Following Spokane County's argument to its natural conclusion reveals its tenuousness. The permitting authority would be encouraged to avoid and defer analyses meant to protect water quality, so as to not trigger other regulation requirements. For these reasons, we reject Spokane County's argument.

Ecology compares the decision to delay a reasonable potential analysis to the EPA's similar decision in Idaho on nearly identical facts. In response to comments from the Spokane Tribe of Indians, the EPA in Idaho wrote, "Numeric toxics control remains an option once we have better data, an appropriate test method approved for use in NPDES permits, and in the event that the

17

[Spokane River Regional Toxics Task Force] fails to achieve measurable reductions in PCB loads." AR at 3751. The EPA also responded, "[I]t is currently infeasible to calculate numeric water quality-based effluent limits for PCBs . . . due to the lack of data." AR at 1536. It further stated, "The lack of data also prevents the EPA from determining whether the Idaho publicly owned treatment works (PTOWs) have the reasonable potential to cause or contribute to excursions above any of the affected jurisdictions' water quality standards for PCBs." AR at 1536.

These responses do not demonstrate that the EPA believed a reasonable potential analysis prior to issuing a permit was discretionary. Instead, the responses show that the EPA agreed that there was insufficient data to create a numeric permit limit and that a reasonable potential analysis was inconclusive. This construal is in line with our above interpretation of the federal regulation.

We conclude that federal regulations required Ecology to conduct a reasonable potential analysis before issuing the Facility a permit but that it has discretion in how to perform the analysis. Because Ecology declared it did not conduct such an analysis, we do not consider whether Ecology's discretion to exercise scientific expertise was usurped by the PCHB in this context. The PCHB did not err by concluding Ecology "should have" conducted a reasonable potential analysis.

Spokane County and Ecology also argue that the PCHB should not have ordered Ecology to modify a Permit condition because Ecology was not required to include a water quality based effluent limitation for PCBs. Spokane County argues the PCHB lacked authority to direct Ecology to modify the permit because the PCHB did not make the conclusion that the Permit was invalid. We do not reach this issue.

"In those cases where the board determines that the department issued a permit that is invalid *in any respect*, the board shall order the department to reissue the permit as directed by the board and consistent with all applicable statutes and guidelines of the state and federal governments." WAC 371-08-540(2) (emphasis added). Here, the Permit was invalid because Ecology failed to conduct a reasonable potential analysis. Therefore, when the PCHB arrived at this conclusion, remand was the proper remedy. For this reason, we do not decide whether the PCHB properly concluded the Permit conditions flowing from Ecology's failure to conduct a reasonable potential analysis were inadequate. We remand to Ecology to conduct a reasonable potential analysis.[13]

B.    Reasonable Potential Conclusion

Spokane County and Ecology argue the PCHB compounded its first error by making its own determination about the reasonable potential analysis. Ecology contends that even if we conclude the PCHB did not err by deciding Ecology should have conducted a reasonable potential analysis, we should reverse the PCHB's order to remand the Permit because the PCHB erred by determining there was a reasonable potential PCB discharges would cause or contribute to a violation of water quality standards. We agree with Ecology that the PCHB should not have conducted its own reasonable potential analysis.

""""[I]n reviewing matters within agency discretion, the court shall limit its function to assuring that the agency has exercised its discretion in accordance with law, and shall not itself undertake to exercise the discretion that the legislature has placed in the agency.""" *Puget Sound*

---

[13] We do note that Ecology cannot avoid setting limits by simply not conducting the reasonable potential analysis. Instead, the language Spokane County and Ecology rely on to justify the permit conditions is triggered when a reasonable potential analysis is conducted and it is determined there is no reasonable potential for contaminating the water, not when Ecology declines to conduct any analysis .

*Harvesters Ass'n v. Dep't of Fish & Wildlife*, 182 Wn. App. 857, 867, 332 P.3d 1046 (2014) (quoting *Rios v. Dep't of Labor & Indus.*, 145 Wn.2d 483, 502 n.12, 39 P.3d 961 (2002) (quoting RCW 34.05.574(1))). "'[S]ubstantial judicial deference to agency views [is] appropriate when an agency determination is based heavily on factual matters, especially factual matters which are complex, technical, and close to the heart of the agency's expertise.'" *Puget Sound Harvesters Ass'n*, 182 Wn. App. at 867 (quoting *Hillis*, 131 Wn.2d at 396).

However, our Supreme Court has previously highlighted the special relationship Ecology shares with the PCHB as contrasted with other agency and board relationships. *See Port of Seattle*, 151 Wn.2d at 594. This relationship results from the EPA's specific delegation of authority to Ecology. *Port of Seattle*, 151 Wn.2d at 594. The PCHB's role is to review permits and if it finds them "invalid in any respect" to remand to Ecology. WAC 371-08-540(2). Ecology, not the PCHB, is the agency empowered by the EPA to issue, manage, and regulate permits in Washington State. RCW 43.21A.020; *see also* RCW 90.48.520 ("In order to improve water quality by controlling toxicants in wastewater, [Ecology] *shall* in issuing and renewing state and federal wastewater discharge permits review the applicant's operations and incorporate permit conditions which require all known, available, and reasonable methods to control toxicants in the applicant's wastewater." (Emphasis added.)). "Rule making, interpretive, and enforcement functions remain with Ecology, the agency 'charged with administration' of water quality statutes and rules." *Port of Seattle*, 151 Wn.2d at 592 (quoting *Dep't of Ecology v. Theodoratus*, 135 Wn.2d 582, 589, 957 P.2d 1241 (1998)).

The PCHB concluded that "the evidence presented support[ed] the conclusion that there is a reasonable potential for the discharge from the Facility to cause or contribute to a violation of water quality standards." CP at 36-37. Ecology argues that the PCHB improperly applied the law

20

by using five factors from the EPA's guidance to conduct a reasonable potential analysis without facility-specific data and from those factors, concluding there was a reasonable potential that discharge from the Facility would cause or contribute to a violation of water quality standards.[14] We agree.

In *Port of Seattle,* the PCHB imposed 16 new conditions on a Clean Water Act certification after Ecology performed a "reasonable assurance" analysis. 151 Wn.2d at 600-01. The PCHB determined that without the new conditions, reasonable assurance would not be met. *Port of Seattle*, 151 Wn.2d at 600-01. The appellants argued that the PCHB should have remanded to Ecology rather than "'repairing' [the Clean Water Act] certification with new conditions." *Port of Seattle*, 151 Wn.2d at 601. The Washington Supreme Court held that "[g]iven the PCHB's statutory role requiring it to provide uniform and independent review of Ecology's actions, it is well within the PCHB's authority to add conditions in order to bring a [Clean Water Act] certification into the realm of reasonable assurance." *Port of Seattle*, 151 Wn.2d at 601.

In contrast, here, the PCHB was not reviewing Ecology's reasonable potential analysis but was conducting its own initial analysis. It could not conduct a de novo review of Ecology's analysis because Ecology acknowledged it did not perform one. The PCHB was not empowered to conduct a reasonable potential analysis. *See* RCW 43.21A.020; *see also Port of Seattle*, 151 Wn.2d at 592 ("Rule making, interpretive, and enforcement functions remain with Ecology, the agency 'charged with administration' of water quality statutes and rules."). In doing so, we conclude the PCHB acted outside its statutory authority.

---

[14] Spokane County does not assert these arguments in its brief.

We affirm the PCHB in part, reverse in part, and remand to Ecology.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Melnick, J.

We concur:

Worswick, P.J.

Lee, J.